May it please the Court, Kelly Zusman appearing on behalf of the United States. With me at council table is Karen Emmergut, U.S. Attorney for the District of Oregon. I would like to reserve five minutes time for rebuttal. Your Honors, this is the United States appeal from a District Court decision dismissing an indictment that charged three defendants with 50 counts of securities fraud and bank fraud. In the opinion, the District Court rested its decision upon three primary concerns. The first relates to the adequacy of the warnings given to the defendants prior to deposition testimony that they gave to the SEC as part of a civil investigation. The second relates to whether or not there was deceit, trickery, or outrageous government conduct. And the third relates to whether or not the United States took advantage of a conflict of interest in discovering a particular transaction that was included in the indictment and that's become known as the Swedish drop shipment. Now the Court's primary concern here brings us to the Fifth Amendment and what's required under the Fifth Amendment. The District Court relied upon dicta from a Supreme Court decision called Cordell. Now Cordell was the case that held that the use of civil interrogatories in a criminal prosecution was permissible. Cordell then goes on to discuss five things that that case was not. One of those things that it was not was it was not a case in which the defendants were told that their criminal prosecution was anticipated. Now Cordell itself cites to a footnote for that proposition. There are three cases in that footnote. There's Smith, Lipschitz, and Garina. Each one of those cases predates Miranda. And in each one of those decisions, the defendants weren't given any warnings whatsoever, nor were they represented by counsel. They all stand in stark contrast to the situation that we have here in which each of the defendants appeared before the SEC for their depositions with attorneys, with an Advice of Rights form that's highly detailed. That's the SEC's 1662 form, which we've included as an addendum to our reply brief. That 1662 form did many, many things that none of the other cases aside from Tabo and Luce did. That 1662 form cited to the defendants the false statement statute. It advised them of their rights to counsel. It cited the perjury statute. It told them their Fifth Amendment rights, that any information they gave could be used against them in any civil or criminal proceeding. On the next page, it tells the defendants, you may refuse to describe the principal uses for the information for the SEC, and it also gives a detailed listing of all the routine uses of that information. Number one, number three, and number five of that list all involve criminal, criminal investigations, criminal prosecutions. There is no question that each of these defendants was fully informed that information that they possess. Now the Supreme Court's decision in Washington held that when a witness appears before a grand jury, even if that witness is a suspect, they're not entitled to any greater rights. So long as Miranda is given, they're fully informed. And if they choose to speak, rather than invoking their Fifth Amendment rights, they do so at their peril. The other key case here is this Court's decision in United States v. Robeson. Now I think Robeson is particularly important here because the District Court in that case shared many of the concerns that the District Court here had. The District Court said, you can't do civil first and then criminal. And this Court reversed. And when this Court reversed, it said some very important things. At page 16 of the Robeson decision, this Court held that to inform a suspect that a civil investigation could have potential criminal consequences. Now that directly contradicts Judge Hagedy's finding. This Court also said that a civil investigator, and I quote, must not affirmatively mislead the taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal charges. That's at page 18. So the District Court here, when they said that the SEC should have told these individuals that their criminal prosecution was anticipated, there is no such requirement. It's not constitutionally required. And the failure to give that kind of a warning cannot constitute outrageous government conduct under this Court's precedent. As recent as the defendants were represented by counsel on this case. That's correct. And just to be very clear here, they received that 1662 form well in advance of the deposition. In fact, they were provided with copies in August when there were document subpoenas issued. So it wasn't like they appeared at the deposition and they were handed the form and expected to read it right there. What significance is there when they ask the SEC lawyer, is anything going on criminally? And she says in effect, that's for me to know and for you to find out. I'm sorry? She says, she gives an evasive answer to the question, is there any criminal prosecution in the wings? And I think it's that particular colloquy between the SEC attorney, Ms. Echevarria, and Mr. Stringer's lawyer, Mr. Martson, has been characterized in many different ways. And that's why I think it's particularly important to look at precisely what was said. And that's in the record. It's ER 1164 and 1165. Now before we even get to that exchange, the SEC attorney said to this defendant and all of the defendants, and I quote, the facts developed in this investigation might constitute violations of other state or federal or civil or criminal laws. Then she asks, did you get a copy of the form? Mr. Martson, Mr. Stringer's attorney, asks her, is he a target of the SEC? The SEC does not have targets. And there's a whole history behind why the SEC doesn't have targets. And that's fully explained by the Supreme Court in its decision, SEC versus Jerry T. O'Brien. So then he asks, the other question I have relate to whether or not in conjunction with your investigation, the SEC is working in conjunction with or has worked in conjunction with any other department of the United States, such as the U.S. Attorney's Office? Her response then is as laid out in the 1662 form, in the routine use section, there are routine uses. And it's the agency's policy not to respond. So she tells him, I'm not going to answer that question. The 1662 form says, that's a confidential matter. I'm not going to answer it. Then Mr. Martson follows up and says, in which U.S. Attorney's Office might I inquire into? And she says, that's a matter within your discretion. Now keep in mind, when she gives that answer, these depositions were taking place in our office. And FLIR is an Oregon corporation. So it's not as if her answer was then directing him to go start calling all 93 U.S. Attorney's Offices. There's a pretty limited field there. Did he have counsel there? He did. Mr. Martson was Mr. Stringer's. Stringer's counsel. Thank you, Your Honor. Each of the defendants was represented by counsel. No question there. Now, I think the other concern that the district court had here about the outrageous government conduct, Judge Haggerty only made three factual Counsel there when Stringer was asking these questions? Actually, it was the attorney that was asking the questions. The attorney was asking. Yes. And Stringer was there listening? Yes. Yes. And this conversation took place in your offices in Oregon, not in Los Angeles? Correct. And this was all on the record, too? That's correct. Reported by a court reporter? I'm sorry? Reported by a court reporter? That's correct. And none of the other defendants had a question. We submitted copies of the beginning of the deposition for each of these defendants. And Mr. Stringer's counsel was the only one who had any questions at all about the forms. Who was representing them at the time? Mr. Stringer? The other defendants. Oh, oh. Mr. Samper was represented by two lawyers, Mr. Glade, his associate, Ms. Caner, and Lois Rosenbaum, who was the attorney for FLIR Industries. And for the third defendant, Mr. Martin, he was represented by Carl Neal, all highly experienced securities lawyers. At what point did Ms. Rosenbaum come to represent all of them? Well, Ms. Rosenbaum never represented Mr. Stringer. She represented Samper up until the time that we notified her that we were opening up a grand jury investigation, at which point she withdrew. She withdrew from representing Mr. Martin prior to his deposition before the SEC. So, Your Honors, I think the district court's concern about the deceit and trickery here, again, in part dovetails with the adequacy of the notice. It relates to the fact that we didn't make our interest in this case known, despite the fact that we've got no constitutional, no statutory duty. At Cordell, there was a statute that required the FDA to provide notice. We have no similar notice requirement here. I think another key piece here comes from the Dresser decision, and that's an en banc case from the D.C. Circuit, in which they explain the historical backdrop to the 1933 and 1934 Securities and Securities Exchange Act. That decision explains in some detail the importance of the SEC's investigations and the importance of cooperating with federal law enforcement. Dresser even says that the SEC can investigate a case with a view towards both civil and criminal penalties. There was nothing wrong about the SEC conducting this investigation, gathering evidence for its own legitimate purposes that also happened to be evidence of a criminal case. Congress specifically contemplated that these cases would result in both criminal and civil penalties where appropriate. And I think it's the Naftalin case where Judge Bright explains why it is important for the U.S. Attorney's Office to be able to have that view, to be able to look at the evidence gathered in the civil investigation and then make a reasoned and informed decision about whether or not prosecution is appropriate. Now, the District Court made just three factual findings to support the conclusion that there was deceit or trickery here. Each of those factual findings we've accepted for purposes of this appeal. They do not rise to the level of outrageous government conduct that would justify dismissal. This Court as recently as this summer in United States v. Mayor reiterated that extremely high standard that's required in order to impose the ultimate sanction on the government of dismissal of one of our indictments for the conduct that we do in the course of the investigation. Mayor noted that in fact there's only been one case in the history of the Ninth Circuit that has dismissed an indictment on that basis and that was the Greene decision in which the government had engineered the crime from start to finish and that was a bootlegging crime. Anything short of that does not justify dismissal. Does the Court have any questions about the conflict issue? If I can address that as well. I would like to know your view of what was going on here because it seems odd. In terms of and relative to Ms. Rosenbaum's representation of both Fleer and Mr. Samper, I think the key piece there is that Judge Haggerty only found that the harm, if you will, that was caused was that we discovered a bogus transaction known as the Swedish drop shipment and that was a $4.6 million sale that was placed on Fleer's books that did not exist. There was absolutely no basis for it and the District Court was concerned that we found out about that from Ms. Rosenbaum. Now in fact this is the one factual finding that we do believe was clearly erroneous and that's because this transaction was discovered by Dave Muesli. He was the comptroller for Fleer Industries. Mr. Muesli discovered that transaction as the result of his work in preparing restatements to try and fix the problems that existed in 1998 and 99 and file correct statements with the SEC. He discovered it. He then disclosed that information to Fleer's outside auditors, PricewaterhouseCoopers and Arthur Anderson. Then he disclosed that information to our office. So Judge Haggerty's conclusion that somehow the Swedish drop shipment was a secret transaction that would be covered by the attorney-client privilege was simply an error. It was a clear error. And because there was no confidential relationship regarding that transaction, there was no basis for the court to dismiss or strike that language from the indictment. What information was provided by the attorney for Fleer that incriminated one of the individuals? The allegation was after the SEC filed its complaint against Mr. Stringer, Martin, Samper and Eagleburger, Ms. Rosenbaum called the SEC and said, gosh, I didn't see the Swedish drop shipment in your complaint. Now keep in mind at that point, Mr. Samper had already settled with the SEC. His consent decree was entered on September 19th of 2002. The complaints filed on September 30th of 2002. The phone call takes place thereafter. And at that point, the civil case is going against Mr. Stringer. It's no longer against Mr. Samper and we haven't indicted yet. So in terms of the theory that somehow someone should have jumped in at that point and moved to have Ms. Rosenbaum removed as conflicted counsel, there was no proceeding to jump into. So I think for that reason also, Judge Haggerty's order was simply unworkable. Oh, but so they were proceeding under the assumption that the civil case was over. As to Mr. Samper. It may have been, yeah. And yet later, they were all indicted. Right. And if I may, I'm going to reserve the remainder of my time for rebuttal. Good morning. May it please the Court, I'm Janet Hoffman on behalf of Mr. Stringer, Mr. Samper, Mr. Martin. A dismissal of an indictment is warranted if the alleged government misconduct is so grossly shocking and so outrageous as to violate the universal sense of justice. Could you pull the mic down a little closer? Thank you. Certainly. The conduct in this case meets this standard. That is the holding of Judge Haggerty. He did not come to this lightly. He did not come to this easily. In March 2005, Judge Haggerty entered an order where he accepted the representations of Mr. Garton that there was no SEC ever participated with the government. Based on those representations, Judge Haggerty denied claimants' motions for discovery and held that these were independent investigations where the government was not working together with the SEC and on that basis denied discovery. Nine months later, Judge Haggerty reversed himself and in an opinion that has many findings of fact, not three, found that the government engaged in trickery and deceit, found that the government engaged in outrageous conduct, and violated the defendant's rights under the Due Process Clause and the administration of justice. What was the trickery? Your Honor, the trickery in this case took place over three years, but it was the intent and the design of the SEC and the U.S. Attorney to keep the criminal investigation hidden from the individuals in this case so that they would not assert their constitutional rights. Does the government have a duty to disclose the criminal investigation? The government does not have an affirmative duty to disclose an investigation and that's clear under United States v. Washington, Crawford and other cases. But in each of those cases the court goes out of its way to point out that these are not cases where there's misconduct or as Judge Graber said in the Crawford case, this is a case where the individual was aware of the nature of the proceedings. So what took place in this case, looking at the language of Cordell, is this was a case where the U.S. Attorney hid behind the SEC, allowed the individuals under investigation to believe it was solely a civil investigation. What would have led them to believe that this was solely a civil investigation? What would have there been in form 1662 that would have possibly given them that idea? Well, first of all, Your Honor, the 1662, it went, was delivered with a cover letter. And in the cover letter the SEC states that we, I'm not giving you an exact quote, it's in the record, but the paraphrase is, we have not made any conclusion regarding responsibility in this case. We have not singled out whether any individuals are responsible for any conduct. They then, in the 1662 form, talk about future conduct. We may share this. We may refer this. Implicit, this is what, the information that they have, right? It's not future information. We may refer our files. We may refer the information we gain in this interview. They're leaving their options open. They are nowhere saying that they are referring it at that moment and that there is a determination that certain people are responsible. In this case, the SEC... You're faulting the government, you're faulting the SEC then for not telling you that they had already had contact with the U.S. Attorney's Office. In this, under the facts of this case, yes. Because under the facts of this... But at that point, your clients hadn't testified, hadn't conducted a deposition with the SEC. That was what the purpose of the cover letter from Ms. Echevarria was, was to advise you that your clients were to bring some documents and appear in a deposition, right? Correct. But actually there had been other discovery that had taken place earlier. I'd think it's really important, Your Honor, to correct a misstatement that occurred in the government's opening argument. And I think that it needs to be honed in on because it's pivotal to part of the deceit that occurred in this case. What Mr. Stringer's attorney asked is, he said, my question is whether Mr. Stringer is the target of any aspect, any aspect of the investigation being conducted by the SEC. The answer to that question is the SEC does not have targets in this investigation. And that was a lie. In this case, Your Honor, the SEC had targets and the U.S. Attorney had targets. But the SEC is not the U.S. Attorney's office. The question is, is there any aspect of the investigation? The SEC was conducting a single investigation and it was conducting it on behalf of the U.S. Attorney and itself. And that is one of Judge Hagerty's holdings in this case. That holding is one of the fact findings and unless clearly erroneous So what would you have had the SEC counsel say in answer to that question? What should Ms. Echevarria have said? The truth would have been, yes, we do. And yes, we do what? Yes, we have targets or yes, the U.S. Attorney has identified targets. My understanding is that the word target has a particular meaning in criminal law. Well, it's a potential defendant. And in this particular case, what you have to look at is you have to look at the email exchange between Ms. Echevarria and Kent Robinson that's quoted in the record. Kent Robinson states to Ms. Echevarria that he only has two targets. He uses the word target. And he's quoted. But even if she was aware that the government was looking at two FLIR employees as potential targets, that's not Ms. Echevarria's business. Oh, it is. But she has no control over what the U.S. Attorney's Office decides to do with the information that she's sharing with them. Your Honor, one of the factual conclusions of Judge Hagerty in this case is that it was a single investigation. And because it was a single investigation where the SEC was doing the investigation for the U.S. Attorney's Office at that time, a truthful answer would have been, yes, Mr. Stringer is a target of the investigation being conducted by the SEC. What was going on here that was, I'm having trouble seeing what is so sinister about the SEC and the U.S. Attorney working together on an investigation. Thank you. I understand. What Judge Hagerty found is that by the U.S. Attorney hiding behind the SEC, it had the appearance that it was solely a civil matter. And because it was solely a civil matter, the individuals in this case were not in a position of asserting the constitutional and procedural rights that they otherwise would have asserted. Why doesn't the fact that they had counsel and were then given the 1662 form which gives them their criminal rights and tells them that what they say is routinely turned over to other prosecution authorities, why doesn't that correct that or take care of that? Because it only talks about future conduct. We may turn this information over. We may make a referral. That meant that any information that they gave in the deposition that was forthcoming would be, might be shared with the U.S. Attorney's Office. It doesn't say anything about anything else that the SEC has turned up. It doesn't say the SEC had to turn a blind eye. It just says you're going to be talking to us in the future. We want to let you know that anything you tell us may be shared with the U.S. Attorney's Office. Now, what's inaccurate about that? What is inaccurate about it is that that is the form that is given to every individual who testifies before the SEC. Subjects, targets, lay witnesses, whoever testifies. It does not create an accurate description for our clients when they were in the sights of the U.S. Attorney and they were trying to send them to jail at that moment. They've got lawyers. Why didn't their lawyers say, invoke your privilege and tell them no thank you, I'm not showing up? What you have to do, Your Honor, is you have to look at it within the context of what was going on at the time. What was taking place at the time is every single indication that these lawyers would have had to heighten their concern that their clients needed that extra protection were wiped away. It was by an agreement with the U.S. Attorney. What we have is in the first meeting in the summer of 2000, it was agreed that the U.S. Attorney conduct its own interviews because the SEC was in a position where it was going to be interviewing the main individuals in the case. This is a meeting between the SEC and the U.S. Attorney? And the U.S. Attorney. Is that wrong? You know, the SEC is the agency that is responsible for enforcing the securities laws as I understand it. The U.S. Attorney is the arm of the Department of Justice that brings prosecutions and enforces the law in court. I don't quite understand why it's wrong for the U.S. Attorney to say conduct your investigation, particularly since as a matter to the SEC, particularly since on their forms they all say that what we get may be used by another agency. I can answer that in two-fold, Your Honor. Mr. Robinson testified before Judge Haggerty and he gave two standards of what's not permissible. Mr. Robinson? He was one of the U.S. Attorneys involved in the case. His two standards were that you cannot mislead the individuals and number two, you can't direct the other investigation. Judge Haggerty found that both those things happened in this case. The U.S. Attorney directed the SEC investigation. It was not an independent investigation and Judge Haggerty found in this record and unless clearly erroneous it is the facts of this case that they directed it. What do you mean by directed? Number one, they had the SEC take interviews here in Portland, Oregon. Even though it was a great inconvenience to the SEC, they did it. But that would have been convenient to your clients, right? It didn't matter what the convenience was to our clients. Are you complaining that your clients were deposed in their hometown? The reason they did it, Your Honor, was they did it in order to have a gravamen for a false statement case. But that could have occurred if you had been doing it in Los Angeles, the SEC's offices, right? Well, technically I think that it could have. But the reason why they did it was they were following Mr. Robinson's request that it be done here. And that request was honored even though there's testimony and facts in the record, it was a great inconvenience to themselves to do it. Mr. Robinson Counsel, I still don't understand. You're complaining that the SEC was inconvenienced. Your clients were convenienced by this. I'm having a hard time figuring out what the problem is. Your Honor, I'm not complaining one way or the other about the convenience or inconvenience. I'm using that as an indication to show you that it would not have been the SEC's ordinary procedure to have had those interviews here in Portland, Oregon. The SEC was sent by Mr. Garten a blueprint of the facts that he wanted to have developed in the SEC investigation. The SEC was told by Mr. Garten that get all the, basically get the information that you can, how our case can be developed based on the fact record that you are able to pull together because as soon as we indict, all discovery will stop. So that they used the SEC as their vehicle to get this information. It was clear to all parties that once the knowledge that the U.S. attorney was involved in this case, all discovery would stop. They had agreements between them as to when the U.S. attorney would make their appearance known. And at each step of the way it was decided that it was better for the U.S. attorney to stay in the background because they would be able to get more information. The intent of both the U.S. attorney and the SEC was to send these individuals to jail. There is an email in the record here from Ms. Taney in response to Ms. Echevarria where she states, and this is after Kent Robinson has given instructions of how to develop false testimony, let's see if this buys Mr. Sampere time in jail. There is another memo between Ms. Echevarria and Mr. Garten where based on your work, based on Mr. Stringer's statements, we're going to be able to send these individuals to jail. This isn't SEC talking about sending people to jail. That isn't their job. But the fact is that they were discussing how to build the best record to send these individuals to jail. Can I change the subject for a second and ask you about the problem with the conflict of counsel? Actually the conflict of counsel, Your Honor, belongs to Mr. Hovatt in this case. Mine is solely the other matter. Or would you like me to wrap up what I'm saying? However you want to do it. You've only got four minutes left and I'd like to hear about the conflict of counsel. Thank you. May it please the Court. My name is Ron Hovatt. I represent Mark Sampere. He is the defendant who had the issue with respect to the conflict of interest. This investigation went on for three years and Mr. Sampere was represented by Lois Rosenbaum and Stole Reeves during the entire period of time between when the investigation first started and when the government finally surfaced almost three years later in February of 2003. Stole Reeves and Lois Rosenbaum had an actual conflict of interest almost from the beginning. How do you impute that to the government? I don't understand how that's their fault. In fact, they wrote him a note. They wrote Rosenbaum a note saying you have a conflict and she wrote back saying basically mind your own business. Exactly right, Your Honor. And from that point forward, the SEC knew they had more knowledge than anybody about the extent of the conflict. And the SEC lawyer testified at the hearing that as time went on, she realized that the actual conflict became worse and worse. And why was that? Because Stole Reeves was representing employees and former employees of FLIR who were providing incriminating information against Mr. Sampere and who were contradicting testimony that he was given to the SEC at the same time he was represented by Lois Rosenbaum. What should the SEC have done that they didn't do? There were two easy things the SEC could have done during the period of time. One was they could have contacted Mr. Sampere's conflict-free counsel who was monitoring counsel. That was the Markowitz-Herbold firm, Peter Glader, Lisa Kainer. That would have been easy. The second easy thing for them to do under their own CFRs, they have a right to tell a lawyer that she has a conflict of interest and can no longer represent Mr. Sampere. The CFR is cited in my brief. You know, that would be the lawsuit we get here. Pardon? Never mind. This looks like a very, very dangerous ground for the SEC to be presuming to tell a person on the other side that they cannot have the attorney that they've got. Whether there's a conflict or not, the SEC has given notice to the parties that they think there's a problem there. No, he hasn't given notice to the parties. The SEC has given notice to the conflicted lawyer. Mr. Sampere and Mr. Glader in the dark. The SEC never approaches Mr. Sampere or Mr. Glader. Is that ethical for them to do that? Well, there's a When they're represented by counsel? I don't understand. Probably not. There is a case that suggests in the Northern District of California that cited in my brief that the government should have somehow communicated to the defendant about the conflict. But look, the government just can't sit by when there's an actual conflict, and they're taking advantage of it. That's the harm here. It's not, you know, I'm not, we'll have a different forum maybe someday to talk about the conduct of Stolle But the government took advantage of it, and in December of 2000, Stolle Reeves and Fleer made a deal with the government to fully cooperate. And we know what that means, fully cooperate under the Holder and Thompson memorandums. She made that deal, never told her other client, Mr. Sampere, continued to represent him for another two years. Part of that cooperation is ferreting out the individuals who are responsible for the illegal conduct in this case. And that includes her other client, Mr. Sampere. And we can see the proof in the pudding. When the Wells submissions occurred, Stolle Reeves made no Wells submission for Mr. Sampere in 2002. They made a Wells submission on behalf of Fleer in which the import of the Wells submission is don't do anything to Fleer, the corporate client, because you're going to do something for the people who are responsible for this wrongdoing, including Mr. Sampere. How did the government benefit? They knew that Mr. Sampere had conflicted counsel who was advising him to continue to give depositions and continue to produce documents. And knowing that he had an actual conflict allowed her to continue to represent him as they questioned him. Okay. So that was so bad that the criminal law should not be enforced against the defendant? Is that? Well, you know, I believe the holding below was, yeah. I mean, if you look at the difference between this case and the case I cited from the Northern District of California, and I think it's sometimes difficult for us to see, is that in that case it involved drug cases and a lawyer who didn't have much of a reputation when he represented informants against the defendant. In this case, we've got a white collar crime and we've got a well-respected law firm. But the facts are exactly the same. This firm, with the government's knowledge and permission, continued to represent informants against Mr. Sampere. Therefore, the client does not get prosecuted, so that the lawyer's client ultimately benefits by the lawyer acting in an unethical manner. Well, of course, the case doesn't get dismissed because of the misconduct of Stolich. The case gets dismissed because of the misconduct of the government in allowing conflicted counsel for two and a half years to represent Mr. Sampere. You know, if he had a counsel that was not conflicted, perhaps he would have made a different decision. Did the government, was the SEC aware of the monitoring counsel? Have they been in contact with the monitoring counsel? Yes. They have been in contact. Well, the monitoring counsel actually attended the sworn statement. Was the monitoring counsel given a copy of the letter that went to Stole-Reeves? No. Nor did Stole-Reeves tell monitoring counsel about the letter. Thank you. Thank you. Would you like to, did you want to say anything in conclusion? We're going a little bit over, but that's all right. Your Honors, what took place here in Judge Haggerty's opinion shocked the conscience. And the problem is how to convey to this Court what took place that made Judge Haggerty make this decision. And what took place in this history of this case is that early on, individuals were identified as targets. Early on, the U.S. Attorney decided that they would obtain tactical advantage by not making their appearance known and letting these individuals believe the matter was solely civil. In Cordell, that was understood by the United States Supreme Court to be a due process violation. The U.S. Attorney insists on calling Cordell dicta. The standard of Cordell was adopted by the Ninth Circuit in Unruh. So we are not talking about some revolutionary court dicta in this case. And also under Miller v. Gammy, the reasoning of the highest court is binding on this Court. We're not discussing dicta in this matter. And what the U.S. Attorney is asking in this appeal in and of itself is shocking. Because they're saying to you, either redo all of Judge Haggerty's findings of fact, which this Court never does unless they're clearly erroneous. It doesn't matter if you disagree. But if he has facts on the record that support his finding, they're the facts of this case. Well, if his finding of outrageousness is based upon a misapprehension of the duties of the government to come forward, then you have a little bit of an issue. Of course. And I guess that's really what the case is about. Of course. But then accept the facts of this record for a moment. Because the facts are Judge Haggerty found the government engaged in trickery and deceit. They did it to avoid the individuals asserting their rights. Those are facts. So if the Court reverses Judge Haggerty and finds his remedy was not appropriate, what the Court would be saying is that the government can engage in trickery and deceit, they can do it to undercut constitutional rights, and there is no remedy. I think we understand your position. Are there any further questions? No. Thank you. Thank you. Thank you. Judge Schroeder, I think you hit the nail on the head. There is nothing sinister that happened here. There is nothing illegal about the U.S. Attorney's Office waiting for the SEC to do its statutory duty and conduct an investigation. There is nothing unconstitutional or outrageous about the U.S. Attorney's Office using information gathered by the SEC for its own criminal prosecution. Unfortunately, I think we have a great deal of hindsight going on here about the identity of targets. This case was a little bit unusual in that the SEC's investigation was prompted by a letter from a former FLIR executive named Steve Palmquist. Mr. Palmquist, after he left FLIR, hired an attorney and then submitted a demand. He wanted to be paid $795,000 or he was going to go to the SEC and blow the whistle on their accounting practices. He wasn't paid. When he went to the SEC, he specifically fingered Mr. Stringer and Mr. Samper. Now, ordinarily, the SEC doesn't start off an investigation with a particular individual or target in mind. They took this case with the understanding that Mr. Palmquist did not come with the purest of motives. That's the only unusual piece about this investigation why we have those two names is because Palmquist is the one that got the ball rolling. So in terms of the hindsight, the record is replete with evidence in which the U.S. Attorney's Office told the SEC there's no criminal case here. In December of 2001, the prosecutor said there's no criminal case here. There's an internal email from the SEC. It's in the declining prosecution. So the suggestion that it was a foregone conclusion that we were going to prosecute completely misapprehends the nature of our work and the way in which we do it. We don't decide to prosecute and then build an investigation on that. We use the investigation to then make a determination, just like Judge Wright said in Knappleman. That's exactly what we do. We look at what is derived by that investigation and then we make an informed decision about a prosecution. Now Judge Haggerty did not in fact find, as Ms. Hoffman suggests, that the U.S. Attorney's Office directed the SEC investigation. He said we were involved, but he never said we directed it. And in fact, the uncontradicted testimony in this case from all of the lawyers for the SEC and from Mr. Robinson was that there was no direction. You can find the testimony from the lawyers at the SEC at ER 355, 527, and 1009. Each of them said they didn't direct our investigation. In fact, we wanted them to stay out of our investigation so that we could fulfill our statutory obligations. Can I ask you a question? There was a reference at the beginning of the defendant's argument to an order in 2005 denying discovery by Judge Haggerty in which he said that there was going to be no criminal investigation and no criminal prosecution apparently in the offing. Can you explain what that was about? Was Judge Haggerty, what was his intention? Sure. There were a number of discovery disputes that arose in this case. And in fact, the defendant sought internal government documents that are normally protected from disclosure under Federal Rule of Criminal Procedure 16. That arose in the context of the defendants trying to get that information. Judge Haggerty initially denied that motion, correctly stating that the SEC and the U.S. Attorney's Office are different organizations. Later on, Judge Haggerty reversed his decision and ordered us to, in fact, produce our internal documents, which is why you have a lot more information here than you ordinarily have in a parallel proceeding case involving the interactions between our offices. When did he reverse himself? Was that before the indictment came down? No, it was after the indictment. It was between 2005 and then his ultimate decision dismissing the indictment in 2006. A little bit about the perjury issue. Mr. Robinson testified that he, in fact, gave generic direction to the SEC about what it takes to create a perjury case. Our office routinely provides advice to federal agencies on what's a crime and what's not a crime. Nothing unusual, nothing impermissible, nothing illegal or unconstitutional about him doing so here. Judge Bivey, you correctly note that each of these defendants were Oregon residents. And, in fact, if venue was such a critical issue, then the court should know that Mr. Stringer actually had three days of deposition testimony that took place in Los Angeles. So the place wasn't an issue. I think Ms. Hoffman's point was that the fact that those depositions were conducted here when the SEC's offices were in Los Angeles suggested that the U.S. Attorney's Office had more than a casual interest in what was going on and was directing or was offering. Do you have any information as to what the circumstances were under which those depositions were decided to be conducted in your offices as opposed to the SEC's offices in L.A.? The SEC conducted at least 19 depositions here in our office with 19 different witnesses. Is there any evidence that for Sampere and Stringer that your office requested or directed or made some very strong suggestion that those depositions be conducted in your offices instead of in L.A.? No. No. Mr. Robinson said that if they were going to bring, if they were going to make false statement charges, that for venue purposes they should be in Oregon. But, in fact, we never charge perjury or false statement. So even to the extent that you consider Mr. Robinson's discussion about perjury charges direction, there's no causal connection here because they were never included in the indictment. They were never charged with perjury or false statement. It's a non-issue. Counsel, before you sit down, with respect to the Stole-Reeves matter, why didn't the SEC contact monitoring counsel? Why didn't they send a copy of the letter they sent to Mr. Sampere's monitoring counsel? I don't believe there's any evidence in the record that would answer that question directly. What I can tell you is that Would there have been anything inappropriate about the SEC counsel CCing the monitoring counsel? Not that I know of. What I can tell you, though, is that the 1662 form also addresses conflicts. It gives the defendant notice that frequently in these types of cases there are conflicts that will arise and that it's up to them to address. The one case that Sampere has cited for the proposition that somehow the SEC should have taken some action to have Ms. Rosenbaum removed as Mr. Sampere's counsel is that SEC versus Higashi decision. What they don't note is that, in fact, the SEC lost that case. They attempted to have company counsel kept out of a deposition of a director and they lost. The court ultimately said that, no, the defendant's choice of counsel was paramount. So I believe that's probably the history behind why the 1662 form says, look, there are frequently conflicts and it's up to you. Buyer beware. You're on notice. You've got to watch out for those conflicts. And Mr. Sampere, by having Ms. Rosenbaum continue as his counsel, was then able to be privy to the other depositions that were generated. He had the benefit of that sharing of information that he otherwise wouldn't have had. Your Honors, I think, you know, we can get mired in the facts here, but the law is clear. Absent a statutory or constitutional obligation, there is no duty on the part of the SEC or the U.S. Attorney's Office to provide some special, some super form of notice to defendants in parallel proceedings. The defendants here that are charged with security fraud are entitled to no greater notice of their rights than someone who is charged with bank robbery or drug dealing or anything else. These defendants received a comprehensive set of warnings. They had experienced attorneys representing them at the time that they gave these statements, and they were entitled to no more. Judge Hagerty's decision was legally erroneous and should be reversed. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Silverman, Bybee